LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
ELAINE CHANG (# 293937 )
**GLANCY BINKOW & GOLDBERG LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com
        lglancy@glancylaw.com
        mmgoldberg@glancylaw.com
        rprongay@glancylaw.com


*Attorneys for Plaintiff Jesse Cowan*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE COWAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AXESSTEL, INC., H. CLARK HICKOCK, and PATRICK GRAY,<br><br>Defendants. | Case No.:  '14CV1037 CAB BGS<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Jesse Cowan ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by AXESSTEL, INC. ("Axesstel" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Axesstel; and (c) review of other publicly available information concerning Axesstel.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of purchasers of Axesstel's securities between February 25, 2013 and March 31, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Axesstel is a provider of wireless voice, broadband access and connected home solutions for the worldwide telecommunications market. Axesstel's product portfolio includes phones, wireline replacement terminals, security alert systems, and 3G and 4G broadband gateway devices. These products are used for voice calling, high-speed data access, and connected home management services.

3.     On June 13, 2013, the Company disclosed a change in the Company's sales leadership following the resignation of Axesstel's Chief Marketing Officer ("CMO") and provided investors updated information about the Company's anticipated second quarter performance and full year 2013 outlook.  Specifically, the Company disclosed that it was anticipating a weak second quarter due to slower demand in Europe, product launches in Africa that were delayed to the second quarter as a result of minor warranty issues, and a slower than expected rollout of the Company's new products in 2013.  Axesstel indicated that revenues for the second quarter would fall substantially below first quarter revenue of $10.1 million, and may be as low as $2 million.  Additionally, the Company indicated that the Company's Chief Executive Officer ("CEO") would be taking over the CMO's responsibilities.

4.     On this news, shares of Axesstel declined $0.30 per share, nearly 30%, to close at $0.71 per share on June 13, 2013, on unusually heavy volume.

5.     Thereafter, on October 17, 2013, the Company disclosed that it had terminated Axesstel's CEO and that the Company's revenues for the third quarter of 2013 were approximately $300,000, well short of the Company's initial expectations.  Moreover, Axesstel disclosed that the Company's accounts receivables included approximately $9 million of sales to customers in Africa, which remained uncollected.  The Company indicated that it was evaluating

various alternatives for collection, including reserves against the accounts or in some cases retaking possession of the product as inventory, and attempting to resell the product to third parties.

6.     On this news, shares of Axesstel declined $0.15 per share, or 60%, to close at $0.10 per share on October 18, 2013, on unusually heavy volume.

7.     On March 31, 2014, the Company revealed that Axesstel's management had concluded that the previously issued financial statements contained in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013, June 30, 2013, and September 30, 2013, should no longer be relied upon because of errors in those financial statements related to the recognition of revenue from sales to two customers in the first quarter of 2013. Axesstel informed investors that the decision had resulted from an investigation by the Company's executive management, with the assistance of the audit committee of the board of directors, outside counsel, and in consultation with the Company's independent accountants.   The investigation was purportedly commenced after receipt of information that revenue had been recognized on two transactions prior to the satisfaction of the necessary criteria for revenue recognition.   For the two orders in question, Axesstel indicated that the products were shipped and revenue recognized prior to March 31, 2013, based on what certain sales employees believed to be firm verbal commitments from two customers in Africa and that the

products were never paid for by the customers and in the fourth quarter of 2013, the products were returned by the customers and the accounts receivable were written off.  According to the Company, the investigation revealed that certain key aspects of the sales to these two customers were not finalized at March 31, 2013, including payment terms and marketing allowances and that, therefore, the revenue associated with these potential sales should never have been recognized.  As a result, Axesstel indicated that it intended to restate its financial information for the first three quarters of 2013 and that management had concluded that the Company's internal control over financial reporting were not effective.

8.     On this news, shares of Axesstel declined $0.01 per share, over 9%, to close at $0.10 per share on April 1, 2014, on unusually heavy volume.

9.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was facing issues that were negatively impacting the rollout of Axesstel's new Home Alert product line; (2) that, in the first quarter of 2013, certain aspects of sales to two customers in Africa, including payment terms and market allowances, were not finalized by the end of the quarter; (3) that the Company improperly recognized revenue from these sales to the two customers in Africa in the first

quarter of 2013 in violation of the Company's stated revenue recognition policy; (4) that, as a result, the Company's revenue and financial results were overstated; (5) that, as a result, the Company misrepresented the progress of the rollout of the new Home Alert product line, as well as the true demand for the new product line; (6) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's financial statements and other statements about Axesstel's business, operations, and prospects were materially false and misleading at all relevant times and/or lacked a reasonable basis.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Axesstel's principle executive offices are located within this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff, Jesse Cowan, as set forth in the accompanying certification, incorporated by reference herein, purchased Axesstel securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Axesstel is a Nevada corporation with its principal executive offices located at 6815 Flanders Drive, Suite 210, San Diego, California 92121.

17.    Defendant H. Clark Hickock ("Hickock") was, at all relevant times, CEO of the Company until October 13, 2013, and was, at all relevant times, a director of the Company until his resignation on October 17, 2013.

18.    Defendant Patrick Gray ("Gray") was, at all relevant times, Chief Financial Officer ("CFO") of Axesstel, and was, at all relevant times, CEO of the Company since October 13, 2013.

19.    Defendants Hickock and Gray are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Axesstel's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the

false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

20.    Axesstel is a provider of wireless voice, broadband access and connected home solutions for the worldwide telecommunications market. Axesstel's product portfolio includes phones, wireline replacement terminals, security alert systems, and 3G and 4G broadband gateway devices. These products are used for voice calling, high-speed data access, and connected home management services.

### Materially False and Misleading
### Statements Issued During the Class Period

21.    The Class Period begins on February 25, 2013.  On this day, the Company issued a press release entitled, "Axesstel Completes Shipments of New Wireless Home Alert Device."  Therein, the Company, in relevant part, stated:

- Expands product suite with wireless security alert systems

- Provides network operators with additional "cut the cord" revenue streams

- Diversifies customer base in Africa

Axesstel, Inc. (OTCQB:AXST), a leading provider of wireless voice, broadband access and connected home solutions for the worldwide telecommunications market, launched its new wireless security alert systems by shipping approximately 40,000 AG50 Series Axesstel Home Alerts to two different customers in Africa.

The AG50 Series Axesstel Home Alert System uses GSM technology and has a built-in cellular module that can send an SMS or place a phone call to up to 8 pre-assigned numbers. This affordable, easy-to-set-up product can be used in homes or other locations for end-users desiring a self-monitored alert notification system. An Axesstel Home Alert utilizing CDMA technology is also available in the AX50 Series.

Clark Hickock, chief executive officer for Axesstel, stated: "The launch of the Axesstel Home Alerts expands our suite of wire-line replacement products and further establishes Axesstel as a leader in developing 'cut the cord' devices. The security alert systems enable network operators to offer new products to their entire subscriber base, resulting in additional revenue without further incremental investment, as well as attract new subscribers. We plan to release a series of five Axesstel Home Alert security systems in key strategic global markets. The security alert system product roadmap includes advanced 'all-in' products incorporating voice, broadband access capabilities and optional features enabling a wide array of connected home applications. We are excited about the worldwide opportunities for this product."

### Benefits

- Provides wireless alert notification with a built-in cellular module that can send an SMS message or place a phone call to up to 8 pre-assigned numbers when the sensor detects motion
- Uses an AC adaptor with a 9V backup battery that provides continued functionality in the event of a power outage
- Arming and disarming can be triggered by keypad input or remotely by sending an SMS
- Delivers an affordable solution, which is easy to set up, configure and use

### Features

- AG50 - 900MHz/1800MHz or 850MHz/1900MHz GSM/GPRS
- AX50 - 800MHz/1900MHz CDMA2000 1xRTT, IS95

- Call or SMS Alerting Numbers - Stores up to 8 pre-assigned numbers
- Remote Arm/Disarm Capabilities
- 9 Multiple LED Indicators - Power, Battery, GSM or CDMA, Setting/Register, Arming/Disarming, Zone Status Indicator 1-4
- Standard Telephone Keypad with Tactile Feel
- Audible Beeper for Programming Confirmation and Motion Detection
- Panic Button for Emergency Situations
- Silent Alarm Capability
- 9 Volt Battery for Emergency Backup
- Low Battery Warning LED
- Tamper Prevention on Alert Panel and Motion Sensor
- Magnetic Contact Window/Door Sensors (optional)
- Configure up to 64 Sensors/Motion Detectors

22.     On February 28, 2013, the Company issued a press release entitled, "Axesstel Reports Fourth Quarter and Full Year 2012 Results."   Therein, the Company, in relevant part, stated:

- Grows full year revenue to $59.7 million; up 10% compared to 2011
- Achieves record gross margin of 26% for the year
- Posts record annual net income of $4.3 million and EPS of $0.16
- Records sixth consecutive quarter of profitability

Axesstel (OTCQB: AXST), a leading provider of wireless voice, broadband access and connected home solutions to the worldwide telecommunications market, reported results for its fourth quarter and year ended December 31, 2012.

For the year ended December 31, 2012, Axesstel reported revenue of $59.7 million and net income of $4.3 million, or $0.16 per diluted share. This compares to revenue of $54.1 million and net income of $1.1 million, or $0.05 per diluted share, for 2011.

Clark Hickock, CEO of Axesstel, stated, "Today we reported the most profitable year in the company's history. Overall, 2012 was our most

successful year ever as we posted records for several key financial metrics: gross margins of 26%, operating income of $4.7 million, net income of $4.3 million and EPS of $0.16. We achieved our operating goals for the year by reporting annual revenue growth of 10% and achieving consistent quarterly profitability as we recorded our sixth consecutive profitable quarter."

Axesstel reported revenue of $15.8 million for the fourth quarter of 2012. Net income for the period was $824,000, or $0.03 per diluted share. This compares to revenue of $16.9 million and net income of $1.0 million, or $0.04 per diluted share, for the same period in the prior year.

Hickock commented, "Contributing to the fourth quarter results were sales from our existing Rev. B Wi-Fi gateway in Europe, which delivered $7.9 million in revenue and continues to be our number one selling product globally. Sales of our wire-line replacement terminal to Sprint contributed $2.1 million in revenue and sales of our first new wireless security alert notification systems to two different customers in Africa totaled $3.5 million in revenue."

The company completed two transactions that bolstered its balance sheet in 2012 and lowered its cost of borrowing. In September, it entered into an agreement with Wistron Neweb Corporation (WNC) to restructure an $8.2 million past due account payable by paying $458,000 in cash and issuing a $7.7 million non-interest bearing note to WNC. The issuance of the note had a $5.1 million positive impact on working capital at December 31, 2012, as that amount was reclassified from a current to long term liability. Also in September, the company entered into a one year $7.0 million credit facility with Silicon Valley Bank. The new facility reduced the company's cost of borrowing to 6% to 7% at current market rates, compared to 16% to 24% under its prior facility.

***Hickock continued, "Our 2012 results represent the successful execution of our strategy to launch competitively-priced products, aggressively reduce operating costs, and shift our customer focus to servicing major carriers in specific markets. We have achieved a significant turnaround and put the company on the right footing for success in 2013 and beyond."***

*"We are very excited about 2013 with the launch of our new dual-mode gateway designed for the European market, which supports both GSM and CDMA technologies in one device, and the upcoming release of the next generation of our wire-line replacement terminals for the North American market."*

*"We also plan to release a series of five Axesstel Home Alert security alert systems in key strategic global markets. The initial product, which was launched in late 2012, provides basic wireless alert functions and is being marketed to the Middle East, Africa and Latin America. The second product provides similar functionality and is planned for release in the United States. The third product integrates the alert system with our wire-line replacement terminal and incorporates "connected-home" applications and will be targeted toward customers in the United States. The fourth and fifth products combine security alert, voice, and high speed data capabilities with a wide array of connected-home applications and are targeted for sale in the US, Europe and Latin America. "*

*"In summary, we made significant progress in 2012 but we believe the best is yet to come. We will focus on broadening our product, geographic and customer platforms to continue our success in 2013," Hickock concluded.*

\* \* \*

**Recent Highlights**

- *Shipped the first product in a new line of Axesstel Home Alert wireless security alert systems to two new customers in Africa.*

- Became a partner on Deutsche Telekom's M2M Marketplace, a global online network dedicated to promoting adoption of M2M products and solutions in the booming M2M market.

- Launched its new SP100 Android smartphone.

(Emphasis added).

23.     On February 28, 2013, Axesstel filed its Annual Report with the SEC on Form 10-K for the 2012 fiscal year.  The Company's Form 10-K was signed by Defendants Hickock and Gray, and reaffirmed the Company's financial results previously announced that day.  The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Hickock and Gray, who certified:

1.      I have reviewed this Annual Report on Form 10-K of Axesstel, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.      The Registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the small Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.     The Registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

24.     On April 8, 2013, the Company issued a press release entitled, "Axesstel Reports First Quarter 2013 Results." Therein, the Company, in relevant part, stated:

> – Revenues of $10.1 million –
> – Record gross margin percentage of 29% –
> – Net income of $84,000 –
> – New $2.3 million three year term loan secured with Silicon Valley Bank –

> Axesstel (OTCQB: AXST), a leading provider of wireless voice, broadband access and connected home solutions to the worldwide telecommunications market, reported results for its first quarter ended March 31, 2013.

> ***Axesstel reported revenues for the first quarter of 2013 of $10.1 million and net income of $84,000, or $0.00 per diluted share. This compares to revenues of $12.0 million and net income of $472,000, or $0.02 per diluted share, for the same period in the prior year.***

> Clark Hickock, CEO of Axesstel, stated, "Revenue in the first quarter was below our operating target, ***but we delivered strong performance on our new Home Alert products and our gross margin percentage. We sold over $4.0 million of our new Home Alert security systems to new customers in the MEA region, which boosted our gross margin percentage to a record 29%. With tight control over operating expenses, we generated net income of $84,000. We also improved our working capital position by $95,000."***

> "Sales from our Rev. B Wi-Fi gateways contributed revenue of $4.3 million, ***Home Alert security systems delivered $4.0 million***, with wireline replacement terminals contributing $1.6 million and phones adding $0.2 million in revenue. We did not receive orders from two significant customers for our top-selling gateway and wireline replacement terminals during the quarter. However, in the second half we expect overall sales for our existing gateway and new dual mode

gateway products to pick up as our European customers work through inventory issues and complete homologation testing of new products. While we did not receive any orders for wireline replacement terminals from Sprint during the quarter, we had record sales of these terminals to regional Tier 2 and 3 carriers in North America. Looking ahead, we are working with Sprint and other national carriers to develop products for launch in the second half of 2013. *We also addressed a minor design issue in our newly-released Home Alert security systems that caused a delay in collection of certain outstanding accounts receivable as well as a slowdown in follow-on orders for those products."*

*"Our Home Alert product line is our initial entrance into the M2M and connected home markets with a security application, giving wireless network operators access to a new segment of these markets. We are pleased with the interest we have received to date and are excited about the new opportunities to broaden our product, geographic and customer platforms. We are also launching the next generation of our core gateway and wireline replacement terminal products. Based on customer feedback, we expect those products to be well received."*

"As stated at the beginning of the year, our primary operating goals for 2013 are to maintain consistent profitability and to increase revenue by ten to fifteen percent year-over-year. As first quarter 2013 revenues were lower than expected, we now anticipate first half 2013 revenue to be lower than initially planned due to a slower rollout of our new products in 2013, and delays in customer testing and customer acceptance. The precise timing and success of these product introductions will have a material impact on our full year results, and the slower first half of the year will make it more difficult to meet our goal for annual revenue growth. *We are releasing the next generation of our core products, as well as additions to our Home Alert products. We believe we will be very well positioned for significant growth in the second half of the year and beyond,"* Hickock concluded.

## Financial Results

***Revenues for the first quarter of 2013 were $10.1 million, compared to $12.0 million in the first quarter of 2012. Gross margin was $3.0 million, or 29 percent of revenue, for the first quarter compared to gross margin of $3.2 million, or 26 percent of revenue, in the same period last year.*** First quarter 2013 operating expenses were $2.7 million compared to $2.3 million in the first quarter of 2012. Net income for the quarter was $84,000, or $0.00 per diluted share, compared to first quarter 2012 net income of $472,000, or $0.02 per diluted share.

At March 31, 2013, cash and cash equivalents were $2.2 million, compared to $1.9 million at December 31, 2012. Working capital was a deficit of $2.1 million at March 31, 2013, compared to working capital deficit of $2.2 million at December 31, 2012.

The company continues to fund its operating requirements through cash flows from operations and bank financings. On March 27, 2013, the company secured a three year $2.3 million term loan with Silicon Valley Bank. In April 2013, the company successfully renewed a one year $1.6 million term loan with a commercial bank in China.

Because of delayed customer collections from sales generated late in the fourth quarter of 2012, the company's accounts receivable balance increased significantly by $6.7 million to $21.9 million at March 31, 2013. The delay in collections necessitated increased borrowing under the company's credit facility to help manage accounts payable to key vendors. Borrowings from the company's bank line of credit were $6.0 million at March 31, 2013, against an aggregate borrowing limit of $7.0 million.

Pat Gray, chief financial officer, commented, ***"While receivables and bank borrowings increased during the quarter, we continue to maintain strong relationships with our key customers, vendors and banks. Since the end of the quarter, we have received payments on the accounts, and expect to collect the balances, and to pay down corresponding bank balances to more traditional levels, over the next several months."***

As a result of these transactions, Axesstel ended the first quarter of 2013 with $9.8 million in bank financings, including $6.0 million under the company's account receivable financing facility, and $3.8 million under two term loans with commercial banks in the United States and China.

**Recent Highlights**

- ***Sold $4.0 million of new Home Alert systems in the first quarter of 2013 totaling $7.5 million over the past two quarters since the product release.***

- Secured a new three year $2.3 million term loan with Silicon Valley Bank.

- Renewed its one year $1.6 million term loan with a commercial bank in China.

- Amended its $7.0 million accounts receivable credit facility to reduce the interest rate on borrowings against eligible accounts receivable.

(Emphasis added).

25.     On May 14, 2013, Axesstel filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal first quarter.  The Company's Form 10-Q was signed by Defendant Gray and reaffirmed the Company's financial results previously announced that day.  The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Hickock and Gray, substantially similar to the certifications contained in ¶23, *supra*.

26.     The above statements contained in ¶¶21-25 were materially false and/or misleading when made because defendants failed to disclose or indicate the

following: (1) that the Company was facing issues that were negatively impacting the rollout of Axesstel's new Home Alert product line; (2) that, in the first quarter of 2013, certain aspects of sales to two customers in Africa, including payment terms and market allowances, were not finalized by the end of the quarter; (3) that the Company improperly recognized revenue from these sales to the two customers in Africa in the first quarter of 2013 in violation of the Company's stated revenue recognition policy; (4) that, as a result, the Company's revenue and financial results were overstated; (5) that, as a result, the Company misrepresented the progress of the rollout of the new Home Alert product line, as well as the true demand for the new product line; (6) that the Company's financial statements were not prepared in accordance with GAAP; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's financial statements and other statements about Axesstel's business, operations, and prospects were materially false and misleading at all relevant times and/or lacked a reasonable basis.

### **The Truth Slowly Begins to Emerge**

27.    On June 13, 2013, the Company issued a press release entitled, "Axesstel Provides Company Update."   Therein, the Company, in relevant part, stated:

– Changes sales leadership following Chief Marketing Officer resignation–

– Delivers revenue expectations for the second quarter of 2013 –
– Continues to anticipate an improved second half –

Axesstel (OTCQB: AXST), a leading provider of wireless voice, broadband access and connected home solutions to the worldwide telecommunications market, ***provided updates on its sales leadership following the resignation of Henrik Hoeffner, its chief marketing officer, as well as its anticipated second quarter performance and full year 2013 outlook.***

Clark Hickock, the Company's chief executive officer, has been increasingly active in key customer relationships and has assumed Mr. Hoeffner's management responsibilities. The sales executives for each of its four key regional markets now report directly to Mr. Hickock. The Company has reached an agreement with Mr. Hoeffner to provide advisory consulting services to transition key accounts and advance key strategic opportunities.

"We want to thank Henrik for his service and contribution to Axesstel," said Hickock. "He has been the consummate professional and assembled a team of experienced and capable regional sales executives who manage our day-to-day sales operations in North America, Latin America, Europe and the Middle East and Africa. We wish Henrik well."

***The Company is anticipating a weak second quarter due to slower demand in Europe, product launches in Africa that were delayed to the second quarter as a result of minor warranty issues, and a slower than expected rollout of the Company's new products in 2013. The Company believes that revenues for the second quarter will fall substantially below first quarter revenue of $10.1 million, and may be as low as $2 million.***

Hickock continued, "Our quarterly revenues have always been subject to volatility based on the timing of large orders. ***The transition to our next generation product lines is moving slower than anticipated, but we will work through these issues and expect our performance to return to historic levels later in 2013. Despite what looks like a very weak second quarter, we are continuing to receive positive feedback from our customers about our new product lines, and expect that the***

*second half of the year will show improved sales and results of operations."*

*"We are confident in our product strategies, including our entrance into the rapidly growing M2M and connected home markets. We expect to retain market share in Europe with our broadband gateway devices and to expand our addressable market with the recent launch of our dual-mode gateway device. We are adding functionality to our next generation of wireline replacement terminals for the North American market. We have multiple releases scheduled for our Home Alert product line, targeted to address the requirements of specific geographic regions or customers.* Scheduled for launch in North America later in 2013, we are putting Home Alert products in the development lab with Sprint, and are working with other carriers in North America and other regions. We need to get these products completed, tested and released, but expect that the Home Alert products will be one of our largest selling product lines. We remain very excited about our future," concluded Hickock.

(Emphasis added).

28.    On this news, shares of Axesstel declined $0.30 per share, nearly 30%, to close at $0.71 per share on June 13, 2013, on unusually heavy volume.

29.    The above statements contained in ¶27 was materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was facing issues that were negatively impacting the rollout of Axesstel's new Home Alert product line; (2) that, in the first quarter of 2013, certain aspects of sales to two customers in Africa, including payment terms and market allowances, were not finalized by the end of the quarter; (3) that the Company improperly recognized revenue from these sales to the two customers in Africa in the first quarter of 2013 in violation of the Company's stated revenue

recognition policy; (4) that, as a result, the Company's revenue and financial

results were overstated; (5) that, as a result, the Company misrepresented the

progress of the rollout of the new Home Alert product line, as well as the true

demand for the new product line; (6) that the Company's financial statements were

not prepared in accordance with GAAP; (7) that the Company lacked adequate

internal and financial controls; and (8) that, as a result of the foregoing, the

Company's financial statements and other statements about Axesstel's business,

operations, and prospects were materially false and misleading at all relevant times

and/or lacked a reasonable basis.

30.    On August 13, 2013, the Company issued a press release entitled,

"Axesstel Reports Second Quarter 2013 Results."   Therein, the Company, in

relevant part, stated:

> Axesstel (OTCQB: AXST), a leading provider of wireless voice,
> broadband access and connected home solutions to the worldwide
> telecommunications market, reported results for its second quarter
> ended June 30, 2013.
>
> Axesstel reported revenues for the second quarter of 2013 of $1.2
> million and net loss of $2.5 million, or a loss of $0.10 per diluted
> share. This compares to revenues of $15.5 million and net income of
> $896,000, or earnings of $0.03 per diluted share, for the same period
> in the prior year.
>
> Clark Hickock, CEO of Axesstel, stated, ***"The second quarter of
> 2013 was a 'perfect storm' for Axesstel, with several issues hitting us
> all at the same time. We experienced a drop in sales of our
> traditional products, a delay in the launch of our new product lines,
> and slow collection of receivables that impacted our cash and***

***working capital position. While we did not anticipate the timing or concurrence of these events, they are each known risks inherent to our business, and we are aggressively managing our way through them. At the same time, and despite the launch delays, our new Home Alert products have generated opportunities that will be very significant if we can convert them to firm orders."***

"In Europe, our two largest gateway customers did not place any significant orders during the second quarter. One of these customers ordered their first half requirements in the first quarter and we expect follow-on orders from this customer in the third quarter. We expect full year orders from this customer to be comparable to last year. The other principal customer for our gateway products experienced slower than expected sell through of our gateway products during the first half of 2013 and continues to work through accumulated inventory. Although we anticipate additional orders once it corrects its inventory levels, the yearly volume for this customer will fall significantly below our original expectations for 2013."

"In North America, we are transitioning our wireline replacement terminal product line to next generation products. We have developed the next generation version of our base terminal with improved performance and a lower price point and are working to establish market share for this product with carriers in North America. In addition, we are nearing completion of a wireline replacement terminal that incorporates some of the functions of our Home Alert product line. We are working with Sprint and other customers on this device. We expected orders for these products to commence in the second quarter, but testing and launch have progressed slower than we originally anticipated, and we now expect orders to commence in the second half of 2013."

***"Finally, the rollout of our new Home Alert product line has progressed slower than originally anticipated. We have experienced some of the normal issues associated with the transition to a new product category. A minor warranty issue in the first quarter delayed the product launch in Africa. We corrected that issue in the second quarter. Those units are now being moved into the channel and are expected to launch during the third quarter, which should result in follow-on orders from those customers in Africa later in the***

*second half of 2013. We are also continuing to demonstrate our Home Alert products to carriers in North America, Europe, and Latin America and are receiving significant interest. Testing and product launch have progressed slower than anticipated, but interest in the product line remains high, and we expect orders to come in later in the third quarter or fourth quarter of the year.* Due to the elongated sales cycles with Tier 1 carriers in North America, we are pursuing an additional path to bring our new Home Alert product line directly to retail outlets through various mobile virtual network operators. This strategy allows for a more streamlined certification process, thereby quickening time to market."

"We are not going to minimize the significance of our first half operating results. The net loss has had a significant impact on our working capital position. *Nonetheless, we continue to have confidence in our long term strategic direction. We expect orders for our gateway and Home Alert products to build in the third quarter. We continue to receive high customer interest in our Home Alert products and are pursuing significant opportunities for this new product line which, if successful, could result in a strong fourth quarter. We continue to believe our new Home Alert product line, along with our new gateway and advanced terminal products, position the company well for growth in late 2013 and beyond,"* Hickock concluded.

## Financial Results

Revenues for the second quarter of 2013 were $1.2 million, compared to $15.5 million in the second quarter of 2012. Gross margin was $335,000, or 28 percent of revenue, for the second quarter compared to gross margin of $3.6 million, or 23 percent of revenue, in the same period last year. Second quarter 2013 operating expenses were $2.9 million compared to $2.3 million in the second quarter of 2012. Net loss for the quarter was $2.5 million, or a loss of $0.10 per diluted share, compared to second quarter 2012 net income of $896,000, or earnings of $0.03 per diluted share.

For the six months ended June 30, 2013, the company reported revenue of $11.3 million and gross margin of 29 percent, compared to $27.6 million and 25 percent, respectively, for the first half of 2012.

Net loss for the first half of 2013 was $2.4 million, or a loss of $0.10 per diluted share, compared to a net income of $1.4 million, or earnings of $0.05 per diluted share, in the first half of 2012.

At June 30, 2013, cash and cash equivalents were $76,000, compared to $1.9 million at December 31, 2012. Working capital was a deficit of $4.8 million at June 30, 2013.

Pat Gray, chief financial officer, commented, ***"The reduction in cash is due in part to slow collection of accounts receivable. We started the quarter with $21.9 million of accounts receivable. We finished the quarter with an account receivable balance of $15.2 million, of which, $12.2 million was past due. We collected $7.7 million of accounts receivable during the quarter and an additional $3.0 million to date in the third quarter. We expect to collect the remaining receivables in the second half of 2013."***

The company has traditionally funded its operating requirements through cash flows from operations and bank financings. Axesstel ended the second quarter of 2013 with $6.0 million in bank financings, including $2.1 million under the company's account receivable financing facility, and $3.9 million under two term loans with commercial banks in the United States and China. The recent net loss caused an event of default under the Company's $2.25 million term loan facility, and the company is working with the bank on a forbearance arrangement and restructured repayment arrangement. Consequently, the company has reclassified the long term portion of the term loan to a short term liability at June 30, 2013.

(Emphasis added).

31.    On August 13, 2013, Axesstel filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal second quarter.  The Company's Form 10-Q was signed by Defendant Gray, and reaffirmed the Company's financial results previously announced that day.  The Company's 10-Q also contained Sarbanes-

Oxley required certifications, signed by Defendants Hickock and Gray, substantially similar to the certifications contained in ¶23, *supra*.

32.    The above statements contained in ¶¶30-31 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was facing issues that were negatively impacting the rollout of Axesstel's new Home Alert product line; (2) that, in the first quarter of 2013, certain aspects of sales to two customers in Africa, including payment terms and market allowances, were not finalized by the end of the quarter; (3) that the Company improperly recognized revenue from these sales to the two customers in Africa in the first quarter of 2013 in violation of the Company's stated revenue recognition policy; (4) that, as a result, the Company's revenue and financial results were overstated; (5) that, as a result, the Company misrepresented the progress of the rollout of the new Home Alert product line, as well as the true demand for the new product line; (6) that the Company's financial statements were not prepared in accordance with GAAP; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's financial statements and other statements about Axesstel's business, operations, and prospects were materially false and misleading at all relevant times and/or lacked a reasonable basis.

33.     On October 17, 2013, Axesstel filed a Current Report with the SEC on Form 8-K.  Therein, the Company, in relevant part, stated:

**Item 5.02.   Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On October 13, 2013, our Board of Directors appointed Patrick Gray, our current Chief Financial Officer, to the additional role of Chief Executive Officer, effectively immediately. Mr. Gray has been our Chief Financial Officer since 2007. Additional information concerning Mr. Gray's background and experience can be found in our definitive proxy statement on Schedule 14A filed with the SEC on April 30, 2013.

Mr. Gray succeeds Mr. Clark Hickock. ***On October 14, 2013, our Board of Directors provided Mr. Hickock with notice of its election to terminate his employment agreement with the company, dated June 7, 2012, without cause, in accordance with its terms.*** Under that employment agreement, Mr. Hickock is entitled to 30 days notice of termination and to payment of certain severance compensation.

On October 17, 2013, Mr. Hickock gave notice of his resignation as a member of our Board of Directors effective immediately.

**Item 8.01.   Other Events.**

In connection with our quarterly report on form 10-Q for the period ended June 30, 2013, we stated "We expect that our third quarter operations will improve as compared to the second quarter, but not to historic levels. Customer interest suggests that, if we can convert identified opportunities to firm orders, we could have a strong fourth quarter."

Our revenues for the third quarter of 2013 were approximately $300,000, well short of our initial expectations. We expected sales of our gateway products in Europe to pick up during the third quarter. We did receive an order from one of our two major European customers, but that order is for delivery in the fourth quarter of 2013

and first quarter of 2014. The second major customer is not expected to place additional orders until 2014. We also expected to generate revenue from sales of our Home Alert product line. We have been working with carriers and retailers in North America and other regions, but we did not complete any material sales during the quarter. We have a some backlog of orders entering the fourth quarter. However, we do not expect our fourth quarter revenues to reach the levels we experienced in 2011 and 2012.

We used cash collected from accounts receivable to fund operations during the third quarter. We began the quarter with $15.1 million of accounts receivable, and collected $4.0 million of those accounts during the quarter. ***The remaining $11.1 million of accounts receivable includes approximately $9.0 million of sales to customers in Africa. Those accounts are aging and we are evaluating various alternatives for collection, including reserves against the accounts or in some cases retaking possession of the product as inventory, and attempting to resell the product to third parties.***

(Emphasis added).

34.     On this news, shares of Axesstel declined $0.15 per share, or 60%, to close at $0.10 per share on October 18, 2013, on unusually heavy volume.

35.     On November 19, 2013, Axesstel filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal second quarter.  The Company's Form 10-Q was signed by Defendant Gray.  The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendant Gray, substantially similar to the certifications contained in ¶23, *supra*.

36.     The statements contained in ¶¶33 and 35 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was facing issues that were negatively impacting

the rollout of Axesstel's new Home Alert product line; (2) that, in the first quarter of 2013, certain aspects of sales to two customers in Africa, including payment terms and market allowances, were not finalized by the end of the quarter; (3) that the Company improperly recognized revenue from these sales to the two customers in Africa in the first quarter of 2013 in violation of the Company's stated revenue recognition policy; (4) that, as a result, the Company's revenue and financial results were overstated; (5) that, as a result, the Company misrepresented the progress of the rollout of the new Home Alert product line, as well as the true demand for the new product line; (6) that the Company's financial statements were not prepared in accordance with GAAP; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's financial statements and other statements about Axesstel's business, operations, and prospects were materially false and misleading at all relevant times and/or lacked a reasonable basis.

## **Disclosures at the End of the Class Period**

37.     On March 31, 2014, the Company filed a current report with the SEC on Form 8-K.  Therein, the Company, in relevant part, stated:

### **Item 2.02.   Results of Operations and Financial Condition.**

We are announcing our preliminary unaudited results of operations for the fourth quarter of 2013 and for the year ended December 31, 2013.

*Revenues for the fourth quarter were approximately $800,000. For the year ended December 31, 2013, revenues were approximately $8.6 million. As discussed in Item 4.02 below, we are restating our financial statements for the first quarter of 2013, which we believe will result in a $3.9 million reduction in revenue for that period and for the year ended December 31, 2013.*

*We anticipate a net loss for the year of approximately $10.0 million. The net loss may increase, depending on the final determination of inventory reserves.*

We finished the year with cash and cash equivalents of $10,000 and a working capital deficit of approximately $12.0 million, subject to possible increase depending on final determination of inventory reserves. *The low revenues and continued slow collection of accounts receivable have significantly constrained our cash resources. We remain in default under our $2.3 million Loan and Security Agreement with Silicon Valley Bank. Our $1.6 million term loan with Bank of Communications, Ltd. in China comes due in April 2014. We are currently negotiating an extension of the term of that loan, but have not reached agreement for any extension at this time. We continue to be significantly past due to our contract manufacturers in China. Those manufacturers have restricted their credit terms with us.*

Our fourth quarter revenue resulted from sales of our gateway products to a customer in Europe. We will generate some additional sales to this customer during the first quarter of 2014. However, this customer and our other key European customer for our gateway products plan to transition their networks to 4G during calendar 2014. There are a number of competitors offering gateway products for 4G networks and, as a result, we are not anticipating significant orders for our traditional gateway products in 2014. We are focusing our efforts on sales of our Home Alert products, particularly in North America.

**Item 4.02.  Non-Reliance on Previously Issued Financial Statements or a Related Auditor Report or Completed Interim Review.**

*On March 27, 2014, executive management of our Company concluded that the previously issued unaudited financial statements contained in our quarterly report on Form 10-Q for the quarter ended March 31, 2013, and the two subsequent unaudited quarterly reports on Form 10-Q in 2013 for the periods ended June 30, 2013 and September 30, 2013 (collectively the "Prior Periods"), should no longer be relied upon because of errors in those financial statements. The errors relate to the recognition of revenue from sales to two customers in the first quarter of 2013. In addition to the financial statements of the Prior Periods, related press releases furnished on current reports on Form 8-K, reports and stockholder communications describing our financial statements for the Prior Periods should no longer be relied upon.*

*The conclusion that the financial statements for the Prior Periods cannot be relied upon is the result of an investigation by our executive management, with the assistance of the audit committee of our board of directors, our outside counsel, and in consultation with our independent accountants. The investigation commenced following the recent receipt of information that revenue was recognized on two transactions prior to the satisfaction of necessary criteria for revenue recognition.* Our policy is to recognize revenue from product sales when the risks of loss and title pass to the customer, assuming all other revenue recognition criteria are met. Depending on the terms of sale, title and risk of loss pass on delivery to the common carrier on shipment, or on delivery to the customer's facility. *For the two orders in question, products were shipped and revenue recognized prior to March 31, 2013, based on what certain of our sales employees believed to be firm verbal commitments from two customers in Africa. The products were never paid for by the customers and in the fourth quarter of 2013, the products were returned by the customers and the accounts receivable were written off. However, our recent investigation revealed that certain key aspects of the sales to these two customers were not finalized at March 31, 2013, including payment terms and marketing allowances. Therefore, the revenue associated with these potential sales should never have been recognized.*

*Preliminary indications are that the impact to the Prior Periods of correcting the errors in revenue recognition will be to decrease*

*revenue for the quarter ended March 31, 2013 and for the nine month period ended September 30, 2013 by approximately $3.9 million, with corresponding decreases in operating income and net income, and an increase in total stockholders' deficit.* We are continuing to evaluate the total amount of the adjustments and the specific impact on each period covered by the restatement, which may result in an increase or decrease in previously reported amounts for the Prior Periods.

*We intend to include restated financial information for the first three quarterly periods in our Annual Report on Form 10-K for the year ended December 31, 2013, to reflect the resulting adjustments in revenues, net loss, and additional non-cash items in our financial statements.* As a result of the restatement of our interim results, as well as delays in completing our audit as a result of our limited financial resources, we do not expect to file our Annual Report on Form 10-K by the March 31, 2014 filing deadline. We currently expect to file our Annual Report on form 10-K in early May 2014.

We have considered the effect of the restatement on our prior conclusions of the adequacy of our internal controls over financial reporting at the end of each of the applicable restatement periods. *As a result of the errors described above, management has concluded that the Company's internal control over financial reporting were not effective to a reasonable assurance as of the ends of each of the periods covered by the restatement.* We will amend any disclosures pertaining to our evaluation of such controls and procedures as appropriate in connection with the Annual Report on Form 10-K. We have subsequently designed and implemented new internal controls and procedures to strengthen our internal controls over financial reporting specifically with regard to the determination of revenue recognition. With these changes now in place, management believes that our internal controls over financial reporting are effective at the "reasonable assurance" level.

(Emphasis added).

38.     On this news, shares of Axesstel declined $0.01 per share, over 9%, to close at $0.10 per share on April 1, 2014, on unusually heavy volume.

## AXESSTEL'S VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## <u>FILED WITH THE SEC</u>

35.     These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper recording of revenue, in violation of GAAP rules.

36.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

37.     The fact that Axesstel announced that it intends to restate its financial statements, and informed investors that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, 7-13; SFAS No. 154, 25).

38.   Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)   The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, 10);

(b)   The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, 34);

(c)   The principle that "financial reporting should provide information about the economic resources of Axesstel, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, 40);

(d)   The principle that "financial reporting should provide information about Axesstel's financial performance during a period" was violated (FASB Statement of Concepts No. 1, 42);

(e)   The principle that "financial reporting should provide information about how management of Axesstel has discharged its stewardship

responsibility to owners (stockholders) for the use of Axesstel resources entrusted to it" was violated (FASB Statement of Concepts No. 1, 50);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, 58-59);

(g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, 79); and

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, 95).

39.     The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Axesstel securities between February 25, 2013 and March 31, 2014,

inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Axesstel securities were actively traded and quoted on the OTCQB, a highly efficient marketplace. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Hundreds of thousands of Axesstel shares were traded publicly during the Class Period, demonstrating an active and broad market for Axesstel stock and permitting a strong presumption of an efficient market. Record owners and other members of the Class may be identified from records maintained by Axesstel or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, management, and prospects of Axesstel; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

46.    The market for Axesstel securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements, and failures to disclose, Axesstel securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Axesstel securities relying upon the integrity of the market price of the Company's securities and market information relating to Axesstel, and have been damaged thereby.

47.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Axesstel  securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and/or omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about the Company, its business, operations, management, and prospects, as alleged herein.

48.    At all relevant times, the material misrepresentations and/or omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants

made or caused to be made a series of materially false and/or misleading statements about Axesstel's business, operations, management, and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

49.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

50.   During the Class Period, Plaintiff and the Class purchased Axesstel securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

51.   As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name

of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Axesstel, his control over, and/or receipt and/or modification of Axesstel allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Axesstel, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

52.    The market for Axesstel securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Axesstel securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Axesstel securities and market information relating to Axesstel, and have been damaged thereby.

53.    During the Class Period, the artificial inflation of Axesstel's stock was caused by the material misrepresentations and/or omissions particularized in this

Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Axesstel's business, operations, management, and prospects. These material misstatements and/or omissions created an unrealistically positive assessment of Axesstel and its business, operations, management, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

54. At all relevant times, the market for Axesstel securities was an efficient market for the following reasons, among others:

(a) Axesstel stock met the requirements for quotation and/or listing, and was quoted and/or listed and actively traded and/or quoted on the OTCQB, a highly efficient marketplace;

(b) As a regulated issuer, Axesstel filed periodic public reports with the SEC;

(c) Axesstel regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of

press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Axesstel was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

55.    As a result of the foregoing, the market for Axesstel securities promptly digested current information regarding Axesstel from all publicly available sources and reflected such information in Axesstel's stock price. Under these circumstances, all purchasers of Axesstel securities during the Class Period suffered similar injury through their purchase of Axesstel securities at artificially inflated prices and a presumption of reliance applies.

## **NO SAFE HARBOR**

56.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they

were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Axesstel who knew that the statement was false when made.

### FIRST CLAIM
**Violation of Section 10(b) of
The Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

57. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Axesstel securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions

set forth herein.

59.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Axesstel securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

60.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Axesstel's business, operations, management, and prospects, as specified herein.

61.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Axesstel's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue

statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Axesstel and its business, operations, management, and prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

62.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

63.   The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Axesstel business, operations, management and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business and operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Axesstel  securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information

that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Axesstel securities during the Class Period at artificially high prices and were damaged thereby.

65.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Axesstel was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Axesstel securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

68.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.    The Individual Defendants acted as controlling persons of Axesstel within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71. As set forth above, Axesstel and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

DATED:  April 24, 2014            **GLANCY BINKOW & GOLDBERG LLP**


By:  *s/ Lionel Z. Glancy*
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
Elaine Chang
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff Jesse Cowan*

## SWORN CERTIFICATION OF PLAINTIFF

Axesstel, Inc., **SECURITIES LITIGATION**

I, Jesse Cowan, certify that:

1.  I have reviewed the complaint and authorized its filing.

2.  I did not purchase Axesstel, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions Axesstel, Inc., during the class period set forth in the Complaint are as follows:

    See Attached Transactions

5.  I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    ___ Check here if you are a current employee or former employee of the defendant Company.

    I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 4-7-14          Jesse Cowan

(Please Sign Your Name Above)

**Jesse Cowan's Transactions in Axesstel Inc.**

| Date | Transaction Type | Ticker | Company | Shares | Price | Amount |
|------|------------------|--------|---------|--------|-------|--------|
| 2/28/2013 | Purchase | AXST | Axesstel Inc | 1,000 | 1.4700 | $ 1,470.00 |
| 4/2/2014 | Sale | AXST | Axesstel Inc | 1,000 | 0.0851 | $      85.10 |

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
JESSE COWAN, Individually and on Behalf of All Others Similarly Situated,

**(b)** County of Residence of First Listed Plaintiff   Oklahoma Co., OK
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Lionel Z. Glancy (#134180), Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100, Los Angeles, CA 90067
Telephone: (310) 201-9150

## DEFENDANTS
AXESSTEL, INC., H. CLARK HICKOCK, and PATRICK GRAY,

County of Residence of First Listed Defendant   San Diego Co., CA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**'14CV1037 CAB BGS**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☒ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                 *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
      Proceeding

☐ 2  Removed from
      State Court

☐ 3  Remanded from
      Appellate Court

☐ 4  Reinstated or
      Reopened

☐ 5  Transferred from
      Another District
      *(specify)*

☐ 6  Multidistrict
      Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Private Securities Litigation Reform Act, 15 U.S.C. §§78j(b) and 78t(a); and 17 C.F.R. §240.10b-5
Brief description of cause:
Securities fraud - Violations of Sections 10(B) and 20(A) of the Exchange Act and SEC Rule 10B-5

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
04/24/2014

SIGNATURE OF ATTORNEY OF RECORD
s/ Lionel Z. Glancy

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.    **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

VI.    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII.    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.