# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Amish Patel, Individually and on behalf of all others similarly situated,<br><br>                                          Plaintiff,<br><br>vs.<br><br>Axesstel, Inc., H. Clark Hickock, and Patrick Gray,<br><br>                                          Defendant. | Case No.:  3:14-CV-1037-CAB-BGS<br><br>**ORDER DENYING MOTION TO DISMISS** |

On April 24, 2014, Jesse Cowan filed a putative class action complaint against Defendants Axesstel, Inc. ("Axesstel"), its former Chief Executive Officer ("CEO"), H. Clark Hickock, and its Chief Financial Officer ("CFO") and current CEO, Patrick Gray, alleging violation of federal securities laws.  The Court then granted an unopposed motion by Amish Patel for appointment as lead plaintiff and for approval of class counsel.  On September 22, 2014, Patel filed an amended class action complaint against Defendants.  Defendants have moved to dismiss the amended complaint.  The motion has been fully briefed, and the Court determined that it was suitable for submission without oral argument.  Because the amended complaint alleges facts that create a strong inference of scienter, the motion is **DENIED**.

## I.     The Parties

### A.     The Plaintiff Class

The putative class in this case consists of all purchasers of Axesstel stock between February 28, 2013, to October 17, 2013 (the "Class Period").  [Doc. No. 13 at ¶ 1.]  Lead Plaintiff Amish Patel and named plaintiff Jesse Cowan both purchased Axesstel stock on several occasions during the Class Period.  [*Id.* at ¶¶ 22, 23.]

### B.     Axesstel

Defendant Axesstel is a Nevada corporation founded in 2000 with its principal place of business in San Diego, California.  [*Id.* at ¶¶ 24, 30.]  As of the end of 2012, Axesstel had a total of thirty-five full-time employees, only fifteen of whom were located in the United States.  [*Id.* at ¶ 35.]  Of the thirty-five employees, six were involved in executive, general and administrative functions, three were involved in sales and marketing, and the remainder worked in product development or operations.  [*Id.*]  Axesstel also had eight consultants, including seven in sales and marketing, and one in product development.  [*Id.*]  In its 2012 Form 10-K filing with the Securities and Exchange Commission (the "SEC"), Axesstel stated that it "has a small employee base and depend[s] substantially on [its] current executive officers and key sales, engineering and operational employees." [*Id.* at ¶ 37.]

Axesstel provides various wireless and broadband products, including (1) 3G and 4G broadband gateway devices that can be used to provide wireless broadband data to multiple computers on a network, (2) wireless desktop telephones, and (3) wire-line replacement terminals that provide an alternative to a traditional landline telephone network. [*Id.* at ¶ 30.] Axesstel sells and markets its products worldwide. In the fourth quarter of 2012, Axesstel came out with a new "Home Alert" product line that, once installed, automatically sends messages to pre-assigned phone numbers or email addresses if the home or office is broken into and a sensor is set off. [*Id.* at ¶ 31.] The Home Alert system was intended to be a low cost alternative to traditional monitored alarm services because there is no monthly monitoring fee. [*Id.* at ¶ 33.]

## C.    H. Clark Hickock

Hickock was Axesstel's CEO from March 2008 through October 13, 2013, and a director from March 2008 through October 17, 2013. [*Id.* at ¶ 25.] In addition, in early June 2013, Hickock assumed the management responsibilities of Axesstel's Chief Marketing Officer, who resigned on June 7, 2013. [*Id.* at ¶ 38.] Going forward, the sales executives for each of Axesstel's four key regional markets reported directly to Hickock. [*Id.*] When announcing this change on June 13, 2013, Axesstel explained that Hickock "has been increasingly active in key customer relationships." [*Id.*] Along these lines, Hickock spent four weeks in

3

Africa in early 2013 during which he had 13 customer meetings and met with a logistics partner and local wireless operators.  [*Id.* at ¶ 129.]

Hickock participated in the issuance of, signed, or certified as accurate pursuant to a Sarbanes-Oxley Required Certification,[1] most or all of the alleged false statements that form the basis of Plaintiffs' securities fraud claim, including statements made in several of Axesstel's SEC filings during the Class Period.  [*Id.* at ¶ 26.]

### D.   Patrick Gray

Gray was Axesstel's CFO from February 2007 through the present, and has also been CEO since October 13, 2013, following Hickock's termination.  [*Id.* at ¶ 27.]  Prior to joining Axesstel, Gray held various finance and accounting positions

---

[1] The amended complaint alleges that Hickock and Gray certified that they had reviewed the respective filing and that:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report.

[Doc. No. 13 at ¶ 90.]

with other companies.   [*Id.*]   He has an M.B.A. and a B.S. in business administration with a concentration in accounting.   [*Id.*]   Like Hickock, the complaint alleges that Gray participated in the issuance of, signed, or certified as accurate most or all of the alleged false statements that form the basis of Plaintiffs' securities fraud claim, including statements made in several of Axesstel's SEC filings during the Class Period.

## II.      Factual and Procedural Background

Over the course of its 88 pages, the amended complaint identifies a number of allegedly false statements by Defendants during the Class Period.  However, the crux of Plaintiffs' securities fraud case is that (1) Axesstel improperly recognized and reported revenue from purported sales of its Home Alert products to five customers in Africa in the fourth quarter of 2012 and first quarter of 2013, and (2) Axesstel misrepresented the collectability of the accounts receivable related to this revenue.   As discussed below, Axesstel's alleged false statements were made primarily in its annual and quarterly SEC filings and related conference calls with analysts and investors to discuss those filings.

### A.      Axesstel's Revenue Recognition Policy

The amended complaint alleges, among other things, that Axesstel violated its own revenue recognition policy in connection with the revenue reported in its

SEC filings.  That policy, as stated in several of the filings at issue here, includes the following:

> Revenue from product sales is recognized when the risks of loss and title pass to the customer, as specified in (1) the respective sales agreements and (2) other revenue recognition criteria as prescribed by Staff Accounting Bulletin ("SAB") No. 101 (SAB 101), "Revenue Recognition in Financial Statements," as amended by SAB No. 104, "Revenue Recognition."

[*Id.* at ¶ 42.]   The amended complaint also alleges some of the terms of the accounting bulletins referenced in Axesstel's revenue recognition policy, which state that revenue is realized or realizable only when:

> (a) "Persuasive evidence of an arrangement exists," with the term "arrangement" meaning the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction; (b) "Delivery has occurred or services have been rendered;" (c) "The seller's price to the buyer is fixed or determinable;" and (d)  "Collectability is reasonably assured."

[*Id.* at ¶ 43. (quoting SAB 101(A)(1).]  Further, the amended complaint alleges that SAB 104, Topic 13, 3(b) explains:

> After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs.   Customer acceptance provisions may be included in a contract, among other reasons, to enforce a customer's rights to (1) test the delivered product . . .   Accordingly, when such contractual customer acceptance provisions exist, the staff generally believes that the seller should not recognize revenue until customer acceptance occurs or the acceptance provisions lapse.

[*Id.* at ¶ 51.]

## B.    February 28, 2013

### 1.    SEC Filings

The first set of Axesstel's alleged false statements occurred on February 28, 2013, when it filed with the SEC its Fiscal Year 2012 ("FY 2012") Form 10-K, its FY 2012 Form 8-K, and a separate press release announcing its results that was attached to the Form 8-K (the "FY 2012 PR").  The 10-K was signed by Hickock and Gray, while the 8-K was signed by Gray alone.  [*Id.* at ¶ 70.]  These documents announced Axesstel's financial results for the fourth quarter ("Q4") of 2012, and for FY 2012 as a whole.  To that end, Axesstel recognized a total of $15.8 million in revenue in Q4 2012, which amount included $3.5 million resulting from the purported sales of Home Alert products to two customers in South Africa in Q4 2012.  [*Id.* at ¶¶ 46, 75-76.]  The sales to these two new customers were Axesstel's first reported sales of Home Alert products.  [*Id.* at ¶¶ 78.b, 92.]

### 2.    Conference Call with Investors and Analysts

Axesstel also held a conference call with investors and analysts on February 28, 2013, to discuss its FY 2012 and Q4 2012 financial results.  On this call, Hickock stated that in Q4 2012, Axesstel "launched our first entry level wireless Axesstel home alert security system.  We recorded a total of $3.5 million in

1   revenue from two new customers in Africa, which is one of the developing markets

2   we've targeted for this product." [*Id.* at ¶ 93.]

3       On this call, when asked about the reception for the Home Alert product that

4   had already shipped, Hickock stated: "The reception has been fantastic. I mean

5   not only the ones what we just shipped to Africa, which are getting into the hands

6   of the guards now and the training is going on." [*Id.* at ¶ 127.]

7       **C.    May 14, 2013**

8           **1.    SEC Filings**

9       The second set of false statements occurred on May 14, 2013, when Axesstel

10  filed its Q1 2013 Forms 10-Q and 8-K, as well as a separate press release attached

11  to the Form 8-K (the "Q1 2013 PR"). The 10-Q was signed by Hickock, while the

12  8-K was signed by Gray. [*Id.* at ¶ 70.]   In these documents, Axesstel announced

13  revenue of $10.1 million during Q1 2013. [*Id.* at ¶ 80.] Of this $10.1 million, $4.0

14  million was for purported sales of Home Alert products to a total of three new

15  customers in South Africa and the Middle East. [*Id.* at ¶ 81.] Further, the Q1 2013

16  PR, which was attached to the 8-K form, stated that Axesstel "[s]old $4.0 million

17  of new Home Alert systems in the first quarter of 2013 totaling $7.5 million over

18  the past two quarters since the product release." [*Id.* at ¶ 96.]

19      In addition, Axesstel reported $21.9 million in accounts receivable, which

20  amount included the $3.5 million in purported Home Alert sales to the two

8

customers in South Africa from Q4 2012.  [*Id.* at ¶ 80.c.]  The Q1 2013 PR contained a statement from Hickock explaining the rise in Axesstel's accounts receivable:  "We also address a minor design issue in our newly-released Home Alert security systems that caused a delay in collection of certain outstanding accounts receivable as well as a slowdown in follow-on orders for those products." [*Id.* at ¶ 49.]  Likewise, the Q1 2013 10-Q also explained that two "testing and warranty events on [Axesstel's] new phone and Home Alert products that caused a delay in collection of our accounts receivables out of [Africa]."  [*Id.* at ¶ 48.]

### 2.    Conference Call with Investors and Analysts

Once again, Axesstel also held a conference call on May 14, 2013, with investors and analysts to discuss its filings.  On the call, Hickock discussed Axesstel's purported sales of Home Alert products, stating multiple times that Axesstel sold over $4 million in new Home Alert products to new customers in Africa, noting that these sales "helped boost our gross margin to a record 29%." [*Id.* at ¶ 97.]  Hickock further summarized that in "the first two quarters since its release we have sold a total of $7.5 million of our Alert devices to five new customers in Africa."  [*Id.* at ¶ 97.]

### D.    August 13, 2013

#### 1.    SEC Filings

On August 13, 2013, Axesstel filed its Q2 2013 Forms 10-Q and 8-K with the SEC, as well as a separate press release attached to the Form 8-K (the "Q2 2013 PR"). The 10-Q was signed by Hickock, while the 8-K was signed by Gray. [*Id.* at ¶ 70.]   The Form 10-Q reported Axesstel's financial results for the first six months of 2013, including revenue of $11.3 million and accounts receivable of $15.1 million. [*Id.* at ¶ 85.] These figures included the $4 million in revenue from purported sales of Home Alert products in Africa in the first quarter of 2013.

Meanwhile, in the Q2 2013 PR, Hickock addressed the steep drop in revenue during the second quarter, calling it a "perfect storm" that included a delay in the launch of new product lines and slow collection of receivables, but that "despite the launch delays, our new Home Alert products have generated opportunities that will be very significant if we can convert them to firm orders." [*Id.* at ¶ 100.] Hickock went on to explain that "a minor warranty issue in the first quarter delayed the product launch in Africa. We corrected that issue in the second quarter. Those units are now being moved into the channel and are expected to launch during the third quarter." [*Id.*]

Also in the Q2 2013 PR, Gray addressed the accounts receivable and Axesstel's negative cash flow:  "The reduction in cash is due in part to slow

collection of accounts receivable. . . .  We finished the quarter with an account receivable balance of $15.2 million, of which $12.2 million was past due.  We collected . . . an additional $3.0 million to date in the third quarter.  We expect to collect the remaining receivables in the second half of 2013."  [*Id.*]

### 2.    Conference Call with Investors and Analysts

As with the previous quarterly filings, Axesstel held a conference call with investors and analysts on August 13, 2013.  On this call, Gray again addressed the accounts receivable, noting that $12.2 million was past due as of June 30, 2013, "so we took a real hard look at those past year receivables—and reserves where we thought was appropriate and make sure, you know, based on our best estimate at the time, that how we were reserving at an appropriate level in a level that we think we can collect the remaining receivables without having to take any additional reserves."  [*Id.* at ¶ 133.]  When an analyst followed up on this issue, Gray reiterated that aside from $700,000 that Axesstel had reserved, it believed that the remainder of the $12.2 million was collectible.  [*Id.* ¶ 134.]

### E.    October 17, 2013

On October 17, 2013, Axesstel filed a Form 8-K with the SEC stating that Gray would be taking over the CEO position from Hickock, who had been terminated.  [*Id.* at ¶ 113.]  Hickock also resigned as a board member effective October 17, 2013.  [*Id.*]  The filing also addressed Axesstel's accounts receivable,

stating that although it had collected $4.0 million during the third quarter, $9.0 million of the remaining $11.1 million in accounts receivable were for sales to customers in Africa. [*Id.*] The 8-K continued: "Those accounts are aging and we are evaluating various alternatives for collection, including reserves against the accounts or in some cases retaking possession of the product as inventory, and attempting to resell the product to third parties." [*Id.*]

### F.    March 31, 2014

On March 31, 2014, Axesstel filed another Form 8-K with the SEC. In addition to reporting revenue of $800,000 for Q4 2013, Axesstel explained that it would be restating its financial statements for Q1 2013 which would result in a $3.9 million reduction in revenue for FY 2013. The filing continued:

> On March 27, 2014, executive management of our Company concluded that the previously issued unaudited financial statements contained in our quarterly report on Form 10-Q for the quarter ended March 31, 2013, and the two subsequent unaudited quarterly reports on Form 10-Q in 2013 for the periods ended June 30, 2013 and September 30, 2013 (collectively the "Prior Periods"), should no longer be relied upon because of errors in those financial statements. The errors relate to the recognition of revenue from sales to two customers in the first quarter of 2013. In addition to the financial statements of the Prior Periods, related press releases furnished on current reports on Form 8-K, reports and stockholder communications describing our financial statements for the Prior Periods should no longer be relied upon.
>
> The conclusion that the financial statements for the Prior Periods cannot be relied upon is the result of an investigation . .

. commenced following the recent receipt of information that revenue was recognized on two transactions prior to the satisfaction of necessary criteria for revenue recognition. Our policy is to recognize revenue from product sales when the risks of loss and title pass to the customer, assuming all other revenue recognition criteria are met. . . . For the two orders in question, products were shipped and revenue recognized prior to March 31, 2013, based on what certain of our sales employees believed to be firm verbal commitments from two customers in Africa. The products were never paid for by the customers and in the fourth quarter of 2013, the products were returned by the customers and the accounts receivable were written off. However, our recent investigation revealed that certain key aspects of the sales to these two customers were not finalized at March 31, 2013, including payment terms and marketing allowances. Therefore, the revenue associated with these potential sales should never have been recognized.

. . .

We have considered the effect of the restatement on our prior conclusions of the adequacy of our internal controls over financial reporting at the end of each of the applicable restatement periods. As a result of the errors described above, management has concluded that the Company's internal control over financial reporting were not effective to a reasonable assurance as of the ends of each of the periods covered by the restatement.

[*Id.* at ¶ 115.]

### G.   May 21, 2014

Axesstel filed another Form 8-K with the SEC on May 21, 2014. In this filing, Axesstel stated preliminary unaudited financial results for FY 2013, including revenues for the year totaling $8.6 million, factoring in the $3.9 million

reduction for the Home Alert revenue to Africa in Q1 2013.  The filing also stated

that "[i]n Africa, we had warranty issues which delayed the initial launch of the

products, but ultimately our customers did not complete their purchases."  [*Id.* at ¶

117.]  In addition, Axesstel stated that its general and administrative expenses for

2013 "included a $3.3 million expense related to an account receivable reserve for

accounts sold into Africa in the fourth quarter of 2012."  [*Id.*]

### III.    Discussion

Plaintiffs' first claim is for violation of Rule 10b-5, enacted pursuant to

Section 10(b) of the Securities Exchange Act of 1934.  "Rule 10b–5 forbids,

among other things, the making of any 'untrue statement of a material fact' or the

omission of any material fact 'necessary in order to make the statements made ...

not misleading.'"  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting

17 CFR § 240.10b–5 (2004)).  "The basic elements of a Rule 10b–5 claim . . . are:

(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection

with the purchase or sale of a security, (4) transaction and loss causation, and (5)

economic loss."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing

*Dura Pharm.*, 544 U.S. at 341-42).  In its motion, Axesstel argues only that the

amended complaint does not adequately allege scienter.

## A.    Pleading Standards for Scienter Under the PSLRA

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n.12 (1976)). The Private Securities Litigation Reform Act of 1995 ("PSLRA") created heightened pleading requirements for scienter under Section 10(b) of the Exchange Act:

> in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2) (emphasis added).

In the Ninth Circuit, the required state of mind is that "the plaintiffs must show that defendants engaged in '*knowing*' or '*intentional*' conduct." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (*emphasis* in original) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999)). "[R]eckless conduct can also meet this standard 'to the extent that it reflects some degree of intentional or conscious misconduct,' or . . . 'deliberate recklessness.'" *Id.*; *see also Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (same). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible

or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

When determining whether Plaintiffs have adequately pled scienter on a motion to dismiss, the Court must 1) accept all factual allegations as true, 2) consider the complaint and "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions" to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," and 3) "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs,* 551 U.S. at 322-24. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (2004)). Ultimately, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

The Ninth Circuit determined that the Supreme Court's decision in *Tellabs* "does not materially alter the particularity requirements for scienter claims established in [the Ninth Circuit's] prior decisions, but instead only adds an

additional 'holistic component to those requirements. . . ." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 987 (9th Cir. 2009).  To that end, the Ninth Circuit stated that a court must conduct a dual inquiry when evaluating scienter allegations on a motion to dismiss:

> First, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

*Id.* at 992.  "When conducting [the] holistic review, however, [the court] must also 'take into account plausible opposing inferences' that could weigh against a finding of scienter." *Id.* at 1006 (quoting *Tellabs*, 551 U.S. at 323).

Here, Plaintiffs argue that the small size of Axesstel, the egregiousness of the accounting errors, the relatively large amount of the improperly recognized revenue, and the statements from both Hickock and Gray indicating direct involvement in Axesstel's sales and collections support a strong inference that Defendants' knew or were deliberately reckless with regard to the improper recognition of revenue from African Home Alert sales and subsequent statements as to the collectability of accounts receivable related to the same contracts, and that therefore the amended complaint adequately alleges scienter.  Defendants,

17

meanwhile, contend that the stronger inference from the allegations in the complaint is that Defendants were not yet aware of the insufficient internal controls in the sales department that led to the improper revenue recognition and that the allegations "point more cogently toward the conclusion that Axesstel was simply overwhelmed with integrating a new product launch into its existing business." [Doc. No. 16-1 at 29.]   As the Seventh Circuit, faced with similar competing inferences in *Tellabs* after remand from the Supreme Court, aptly framed the issue: "The critical question, therefore, is how likely it is that the allegedly false statements . . . were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading."   *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (hereinafter, *Tellabs II*).

### B.    The Amended Complaint Adequately Alleges Scienter

#### 1.    Were Defendants Deliberately Reckless In Failing to Obtain Readily Available Information About the Home Alert Sales to Africa?

First, Plaintiff argues that Hickock and Gray had access to the relevant information about the Home Alert sales to Africa and therefore were deliberately reckless in recognizing revenue in violation of Axesstel's revenue recognition policy without reviewing the sales agreements (or lack thereof) of the Home Alert

18

sales to Africa.   In the same vein, Plaintiffs argue that Gray was deliberately reckless when he stated in the Q2 2013 SEC filings and on the related investor call that the past due receivables related to these Home Alert sales to Africa were collectible considering Axesstel did not even have final sales contracts.

Deliberate recklessness is "a form of intentional or knowing misconduct" such that "the plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Zucco*, 552 F.3d at 991 (quoting *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 976 (9th Cir.1999)).   Notwithstanding this high standard, the amended complaint adequately alleges deliberate recklessness in connection with the alleged false statements here.

The SEC filings at issue here, all of which were signed by Hickock, Gray, or both, state that Axesstel only recognized revenue when, among other things, (a) title passed to the customer as specified in the sales agreement, and (b) the price is fixed or determinable.   In other words, a minimal prerequisite for Axesstel to recognize revenue is the existence of a final sales agreement with definitive payment terms.   There is no dispute here that Axesstel recognized revenue without this bare minimum requirement.   Nevertheless, Defendants argue that the amended

1   complaint does not allege scienter because it does not allege that Hickock and Gray

2   actually knew the terms (or lack thereof) of the Home Alert contracts.

3          Defendants essentially argue that the amended complaint does not allege a

4   smoking gun such as a communication to Gray and Hickock stating that no

5   contracts with African customers were finalized.  The pleading standard is not so

6   stringent.  *Tellabs*, 551 U.S. at 324.  *Tellabs* "permits a series of less precise

7   allegations to be read together to meet the PSLRA requirement."  *South Ferry LP,*

8   *No. 2.*, 542 F.3d at 784.  Although Defendants are correct that senior executives

9   cannot be expected to know the details of every contract just by virtue of their

10  officer roles, Axesstel is an exceedingly small company and these were no ordinary

11  contracts.  The total of five contracts in question accounted for twenty to forty

12  percent of the revenue Axesstel was recognizing in the respective quarters.

13  Moreover, these were supposedly the first contracts for sale of the Home Alert

14  products, and sales that Hickock touted on his calls with investors.  Thus, while

15  Hickock and Gray did not have to review every detail of these contracts, it was

16  deliberately and consciously reckless for them to fail to at least confirm that such

17  contracts existed.[2]

18

19  _____

20  [2] Further, the lack of payment terms related to these sales implies that the sales
    figures touted by Hickock were little more than estimates, which also supports
    scienter, as it would be deliberately reckless to recognize a specific amount of

20

Moreover, the allegations in the amended complaint create a strong inference that Hickock and Gray did in fact know the details of these purported sales. For example, in February 2013, Hickock discussed the reception of the products in Africa and the fact that guards were being trained. Likewise, Hickock's May 2013 statement that minor warranty issues caused a delay in collection on the African contracts infers specific knowledge about the sales, including that they were in fact not final, but contingent on acceptance by the customer.[3] Further, on the investor calls, Hickock touted the number of Home Alert contracts to Africa and the amount of revenue attributable to them, while Gray confirmed that "we took a real hard look" at the receivables related to the revenue and found it collectible. To make such statements without even confirming the existence of contracts with set payment terms in place was deliberately reckless and creates a strong inference of scienter.

---

revenue when the final sales price and payment requirements had not even been determined.

[3] Along these lines, Axesstel's restatement indicates that these warranty issues are what caused the customers not to complete their purchases. [Doc. No. 13 at ¶ 117.] This further supports the inference that based on earlier statements concerning these warranty issues, Hickock and Gray knew all along that these sales were not final. Yet Axesstel recognized the revenue anyway. At a minimum, this supports a strong inference of deliberate reckless both about the initial recognition of revenue, and even more about the collectability of this revenue while these warranty issues were pending.

## 2.    The Core Operations Theory

Second, Plaintiffs argue that core operations theory creates a strong inference of scienter.  Under that theory, the Court "can impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company." *Reese*, 747 F.3d at 575.  As the Ninth Circuit explained:

> allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." This view takes such allegations into account when evaluating all circumstances together. Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.

*S. Ferry LP, No. 2*, 542 F.3d at 785-86 (internal citations omitted).

Here, the amended complaint contains numerous statements from the individual defendants themselves indicating that they were directly involved in sales and knew the details of Axesstel's dealings with its African customers.  As for Hickock, in February 2013, he told investors and analysts that "reception [in Africa] has been fantastic."  Between February and May 2013, Hickock spent four

22

weeks meeting with customers and logistic partners in Africa.  Further, in a June

2013 press release, Axesstel announced that Hickock would be taking over the

responsibilities of Chief Marketing Officer and had "been increasingly active in

key customer relationships."[4]  *Cf. Daou*, 411 F.3d at 1022 ("[S]pecific admissions

from top executives that they are involved in every detail of the company and that

they monitored portions of the company's database are factors in favor of inferring

scienter in light of improper accounting reports").   As for Gray, his assurance that

the accounts receivable had been reviewed for collectability necessarily implies

confirmation that the contracts supporting such sales at least existed and were

available for review, which according to the amended complaint was not the case.[5]

In addition to these specific allegations creating an inference of the

individual defendants' scienter, the amount of the falsely recognized revenue,

which came from only a handful of contracts and signified the first sales of a major

---

[4] The amended complaint also contains allegations about Hickock's involvement in sales and marketing based on the statements of a confidential witness.  Because the other allegations in the amended complaint are sufficient to satisfy the PSLRA's scienter requirements, the Court did not consider or rely on the confidential witness allegations for this opinion.

[5] Defendants argue that Gray's failure to discover that the contracts did not exist when reviewing the collectability of the accounts receivable is not evidence of fraud.  This argument is not persuasive.  If Gray did not discover the lack of payment terms for these receivables, his statement that he took a "real hard look" was false and deliberately reckless because no "real hard look" would miss this fact.  If Gray did in fact discover the lack of payment terms or contract, then his reassurance that the receivables were collectable was false and deliberately reckless.

new product for Axesstel, creates a strong inference that Hickock and Gray would be aware of the details of these sales. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008) ("The size of the contract and the prominence of the client raise a strong inference that defendants would be aware of this order."); *see also Curry v. Hansen Medical, Inc.*, No. C 09-5094 CW, 2012 WL 3242447, at *11 (N.D. Cal. Aug. 10, 2012) (stating that because defendant was small company with less than 200 employees and sold so few units, each of which was significant to its revenue stream, the individual defendants must have known about each of the sales).

Further, Hickock's and Gray's roles in Axesstel are magnified by the exceedingly small size of the company.  Axesstel is not to be confused with Apple. The individual defendants here are not officers in a large company who "may be removed from the details of a specific business line or remote business activity." *Reese*, 747 F.3d at 572.  Rather, Axesstel has only thirty-five employees, including only six employees in executive or administrative roles.  Thus, the individual defendants would be among the first (and only) to know of the details of major contracts, or conversely as is alleged here, that products were being shipped despite the fact that no such contracts had been signed. *Cf. Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 WL 2676364, at *12 (C.D. Cal.

July 1, 2008) (factoring the company's relatively small size, with 80-100 employees, in finding allegations of scienter to be persuasive).

In sum, it would be absurd to think that the CEO and CFO of a company with just thirty-five employees, of whom only ten are involved in sales, general or administration, would be unaware of the lack of written agreements or definitive payment terms with the five new customers in Africa that represented the company's first sales of a significant new product that constituted between twenty and forty percent of Axesstel's overall revenue. *See Berson*, 527 F.3d at 989 (9th Cir. 2008) (holding that complaint alleged scienter when the complaint alleged facts supporting an inference that the statements were misleading when made and that the facts were prominent enough that it would be "absurd to suggest" that top management was unaware of them).

With respect to Hickock, this absurdity is compounded in light of his specific involvement in Axesstel's sales. *Cf. In re InfoSonics Corp. Sec. Litig.*, No. 06cv1231 BTM(WMc), 2007 WL 2301757, at * (S.D. Cal. Aug. 7, 2007) (noting that a high-level employee in sales at a company with fewer than thirty employees would be in a position to know about problems with the company's biggest customer). Indeed, both Hickock and Gray made statements about a "minor warranty issue" related to the Home Alert products in Africa. [Doc. No. 13 at ¶¶ 48-50.] That these executives were aware of an issue even they deemed minor

creates a strong inference that they would also be aware of the major issue that no contracts or payment terms were actually in place for the sale of those products. Likewise, it would be absurd to suggest that Gray could have taken (or even supervised) a "real hard look" at receivables related to the African sales without discovering (to the extent he did not already know) that the agreements for such sales were at most verbal, and more significantly, *lacked payment terms*.  *Cf. Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (holding that complaint alleged scienter of top Oracle executives in part because of allegations of specific admissions from top management concerning their involvement in the business and the magnitude of the allegedly improper revenue recognition)

Accordingly, in light of the foregoing, the allegations in the amended complaint concerning Hickock's and Gray's respective roles in Axesstel both generally and with respect to the sales at issue here satisfy the PSLRA's requirement of a strong inference of scienter.

### 3.    Holistic Review and Competing Inferences

Even if the previously discussed individual allegations were not enough on their own to support a strong inference of scienter, a holistic review of these allegations along with all of the other allegations in the amended complaint creates

a cogent inference of scienter that is more compelling than any of the alternative inferences argued by Defendants. *Tellabs,* 551 U.S. at 322-24.

Defendants' argue that "it is more cogent and compelling to infer that Axesstel's management, acting in good faith, was unable to immediately identify and effectively control the internal control and accounting processes within the Company during its product launch with new customers in a new geographic region, than that it was intentionally and systematically manipulating its accounting records to make the Company seem more successful shortly before voluntarily announcing the need to restate." [Doc. No. 21 at 14.] This argument implies that the restatement here is merely a correction of minor technical accounting issue, which simply is not the case.

In addition to all of the scienter allegations discussed above, the amended complaint alleges with particularity that Defendants violated simple GAAP accounting principles along with Axesstel's own revenue recognition policy to prematurely recognize millions of dollars in revenue, equaling 22.2% of its revenue in Q4 2012, and almost 40% of its revenue in Q1 2013.[6]  "Certainly,

---

[6] Limiting the calculations to Axesstel's Home Alert product further strengthens the inference of scienter.  Axesstel, through filings and other statements signed or made by Hickock and Gray, announced $7.5 million in Home Alert sales in Q4 2012 and Q1 2013.  According to the amended complaint, none of these sales were final and in fact all of the shipped product was returned.  In other words, Axesstel, through Hickock and Gray, announced $7.5 million in Home Alert sales when the

prematurely recognizing millions of dollars in revenue is not minor or technical in nature." *Daou Sys., Inc.*, 411 F.3d at 1020 (noting that the complaint alleged that 48% of the company's reported revenue was prematurely recognized).  Moreover, "while scienter cannot be established by publishing inaccurate accounting figures, even when in violation of GAAP . . . significant violations of GAAP standards can provide evidence of scienter so long as they are pled with particularity." *Daou Sys., Inc.*, 411 F.3d at 1022; *cf. In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp. 2d 1248, 1273 (N.D.Cal.2000) ("When significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves.").  Here, it strains credulity to believe that Hickock and Gray did not know that no final contracts in fact existed for the Home Alert sales in Africa, when such sales purportedly equaled between 20% and 40% of Axesstel's overall quarterly revenue and 100%

---

actual amount of sales was zero.  Viewed through this lens, the allegations in the amended complaint are similar to a hypothetical from *Tellabs II* used to explain how it is possible to create a strong inference of corporate scienter even if it was unknown what individuals were responsible for dissemination of the false information:  "Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero.  There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Tellabs II*, 513 F.3d at 710; *see also Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (noting that "there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication").

28

of its revenue from its important new product.  *See Brown v. China Integrated*

*Energy, Inc.*, 875 F.Supp. 2d 1096, 1123 (C.D. Cal. 2012) ("It strains credulity to

believe that [the defendant's] directors and officers did not know that a factory that

. . . generated 20% of total company sales was not functioning.").

Nor is Defendants' argument that their voluntary restatement weighs against

scienter compelling.  That Defendants came clean when Axesstel's cash position

was so poor that they likely had no other choice does not lead to a compelling

inference that the individual defendants did not know all along that these purported

sales to Africa were not finalized.  The fact that Defendants' gamble—recognizing

revenue and vouching for the collectability of that revenue in the absence of

contracts with payment terms in the hopes that the customers will ultimately agree

to purchase the products—"fails is not inconsistent with its having been a

considered, though because of the risk a reckless, gamble.  It is like embezzling in

the hope that winning at the track will enable the embezzled funds to be replaced

before they are discovered to be missing."  *Tellabs II*, 513 F.3d at 710.

Ultimately, while it is conceivable that the CEO and CFO of a thirty-five

person company could be completely unaware of the fact that there were no written

contracts for the sale of $7.5 million of their company's new product that had been

shipped to Africa, this possibility is exceedingly unlikely, and more important to

1  this instant analysis, a less compelling inference than the compelling inference of

2  scienter based on a holistic review of the allegations in the amended complaint.

3       Accordingly, given the size of Axesstel, Hickock's and Gray's management

4  roles in Axesstel and their alleged involvement in sales and the complete lack of

5  contracts for the purported sales of Home Alert products in Africa at issue here, the

6  egregious nature GAAP violations, and the amount of the improperly recognized

7  revenue, there is a logical, and strong, inference that Defendants were aware at the

8  time the false statements were made that the revenue was being recognized

9  improperly.  Moreover, this inference is far more compelling than Defendants'

10  hypothesis that the false statements were merely the result of being overwhelmed

11  with a new product launch.

12       **C.    Section 20(a)**

13       Plaintiffs' claim under Section 20(a) of the Exchange Act requires "(1) a

14  primary violation of federal securities law, and (2) that the defendant exercised

15  actual power or control over the primary violator."  *Howard v. Everex Sys.*, 228

16  F.3d 1057, 1065 (9th Cir. 2000).  Axesstel's motion to dismiss this claim is

17  predicated entirely on its argument that the amended complaint fails to state a

18  primary violation of Section 10(b) for failure to adequately allege scienter.  Thus,

19  because the Court finds that the amended complaint pleads a strong inference of

20

scienter for purposes of establishing a primary violation of Section 10(b), the motion to dismiss the Section 20(a) claim fails.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is **DENIED**.  It is **SO ORDERED**.

Dated:  February 13, 2015

_____
Hon. Cathy Ann Bencivengo
United States District Judge

31